J-A06004-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| BRIAN LEE JEFFERIES | : | |
| | : | |
| Appellant | : | No. 193 WDA 2025 |

Appeal from the Judgment of Sentence Entered December 12, 2024
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0003470-2023

BEFORE:  OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY OLSON, J.:                    **FILED: April 21, 2026**

Appellant, Brian Lee Jefferies, appeals from the judgment of sentence entered December 12, 2024, as made final by the denial of his post-sentence motion on January 23, 2025.  We are constrained to vacate Appellant's judgment of sentence and remand for a new trial.

On May 4, 2023, the Commonwealth charged Appellant with various offenses relating to the alleged sexual abuse of his biological daughter, V.J. Prior to trial, the Commonwealth filed a motion *in limine*, seeking to admit evidence of prior bad acts pursuant to Pennsylvania Rule of Evidence 404(b)(2).  More specifically, the Commonwealth sought to introduce evidence that, when Appellant (now 30 years of age) was approximately 15 to 18-years-old, he sexually abused M.M., his biological cousin.[1]  The

---

[1] No criminal charges were filed against Appellant with respect to his alleged sexual abuse of M.M.

Commonwealth claimed that such evidence was admissible to demonstrate evidence of motive, opportunity, intent, common scheme or plan, knowledge, identity and/or absence of mistake. The trial court convened a hearing on the Commonwealth's motion on May 30, 2024, and, ultimately, granted the Commonwealth's motion, concluding that such evidence was admissible under the common plan, scheme or design exception of Rule 404(b)(2).

On September 10, 2024, Appellant's jury trial commenced. The trial court summarized the relevant testimony as follows.

> At trial, Harlie-May Swanger testified that she married Appellant on October 24, 2020, when their daughter, V.J., was 4-years-old[. V.J. was conceived when Ms. Swanger was 14 and Appellant was 18 years of age. Ms.] Swanger and V.J. moved in with Appellant in June of 2020 and [Ms. Swanger] moved out in January 2023. When she moved out, she did not originally take V.J. with her[] because her temporary housing was not suitable for a child. At that time, [Ms.] Swanger trusted Appellant and considered him to be a good father. In March of 2023, [Ms.] Swanger moved back in with her parents and obtained employment. V.J. started spending weekends with [Ms.] Swanger in her parents' home. Appellant and [Ms.] Swanger were on such amicable terms that Appellant joined [Ms.] Swanger and V.J. for family time at [Ms.] Swanger's parents' home.
>
> However, [Ms.] Swanger testified that on April 4, 2023, she received a [telephone] call from V.J.'s school to come pick her up. V.J. was in first grade. V.J. had gone to the nurse complaining of a stomachache. [Ms.] Swanger was not the primary caregiver at the time and only saw V.J. during weekend visits with Appellant. Nonetheless, she picked V.J. up and took her to [Ms.] Swanger's [parent's] home. Later that day, V.J. told [Ms.] Swanger that something was going on with Appellant. That day was the first instance that [Ms.] Swanger and V.J. were together without Appellant present. V.J. asked [Ms.] Swanger to talk with Appellant and tell him to stop kissing her on the lips and stop playing with her "privates" when they were

- 2 -

watching movies together. V.J. had not previously disclosed any allegations of sexual abuse. [Ms.] Swanger called the child's doctor, who referred V.J. to A Child's Place at Mercy Hospital for a forensic evaluation. The evaluation occurred on April 21, 2023.

Meanwhile, V.J. returned to school on [April 11, 2023 and April 12, 2023. At that time, Ms.] Swanger received a [telephone] call from the school that V.J. had said something about what her father was doing to her. Ms. Swanger confronted Appellant and he denied any wrongdoing and offered to take a lie detector test.

[Ms.] Swanger further testified that on the night prior to the forensic examination[,] V.J. told her that she was experiencing pain in her vaginal area. [Ms.] Swanger observed a white discharge coming from the child's vagina and took her to Children's Hospital of Pittsburgh. The hospital diagnosed V.J. with pinworms and started her on antibiotics.

\*\*\*

Lieutenant Mark Glogowski of the Tarentum Borough Police Department testified that he interviewed [Ms.] Swanger on April 13, 2023, as part of his investigation into the underlying allegations made by V.J. He testified that [Ms.] Swanger told him that V.J. disclosed to her that Appellant had touched her "lady parts." Lieutenant Glogowski advised [Ms.] Swanger to take V.J. to Children's Hospital for a physical examination. He also told her that he was going to file a Childline report and refer the matter to both the Allegheny County police and Allegheny County Child and Youth Services.

Beth Brancato, V.J.'s special education teacher, testified that V.J. came to her on the first day of school following Easter break and said to her, "[m]y dad is touching me." Ten minutes later [Ms.] Brancato filed a Childline. After filing the Childline report, [Ms.] Brancato learned that V.J. disclosed [similar claims] to her homeroom teacher immediately prior to disclosing to her.

Anne Marie Mravintz, V.J.'s first grade teacher, testified that on April 11, 2023, V.J.'s first day back from Easter break, she was in the hallway when the front door was unlocked to let the children enter. V.J. came in and loudly said to her, "Ms. Mravintz, I need to talk to you. My dad touched me inappropriately and we're not going to stand for that." [Ms.]

Mravintz held V.J.'s hand and said, "[l]et's walk to our room and get situated. It's important what you have to say, but we can't really say it in public. [Ms.] Mravintz sent V.J. to [Ms.] Brancato's office to check in with her.

Eight-year-old V.J. testified that Appellant toucher her "vagina" or "woman spot" when he was babysitting her at her grandmother's house. She could not remember how old she was when it happened. She testified that it happened more than once in Appellant's room when they watched movies together. V.J. stated that Appellant touched her with his hand on the inside and outside of her vagina. Sometimes it hurt. She also said that Appellant did it in the living room before other people started living there. Appellant would only touch her when her mother was at work. [V.J.] told her mom [about Appellant's alleged abuse] when she was sleeping over at her mom's place for the weekend. She also testified that Appellant watched her shower, and she found that creepy. V.J. also said that she didn't like when Appellant would try to come into the bathroom while she was using the toilet. Appellant would sometimes come in and urinate into the tub. Her mom took her to the doctor's office after she said her vagina hurt, and "white worms" were coming out of it. V.J. said she told Ms. Mravintz at school because she couldn't hold it in any longer. She did not remember disclosing it to anyone else. She remembered her forensic interview and she said that she told the truth there. V.J. further testified that Appellant took her hand and put in on the outside of his "vagina" or "man part." She saw white worms come out of his man part.

Next, Jamie Mesar testified under 42 Pa.C.S.A. § 5920 as an expert in the field of victimization, victim behavior, and forensic interviewing. She received no prior information about this case and had never met V.J. She testified [that] research shows, and her research confirms, that in sexual mistreatment cases, "the alleged perpetrator or the person who may have abused the child is often a person very close to the child." She said that many factors affect a child's reporting, including the relation to the perpetrator, feelings of guilt or shame, or fear of getting themselves or the perpetrator in trouble. [Ms.] Mesar testified that delayed reporting is common in child sexual abuse cases. She said that children need to feel safe before they can disclose and there is no specific time frame or reason why a child discloses. Children who are consistent and detailed in their

disclosures are more likely to make credible allegations of abuse.

Detective Carter Cecotti of the Allegheny County Police Department testified that he investigated this case and scheduled the forensic interview. He observed the interview through a two-way mirror. Based on his investigation, he concluded that V.J. consistently said what her father had done to her when she disclosed it to her mother, her two teachers, and the forensic interviewer. The forensic interview was admitted without objection and published to the jury.

[M.M.] testified last for the Commonwealth. She stated that she was Appellant's biological cousin and, that from the time she was 10 years old until she was 13 years old, Appellant touched her inappropriately. [M.M.] testified that Appellant touched her breasts with his hands and touched her vagina with his fingers and his penis. Usually she was clothed, but occasionally he made her take off some of her [clothing]. Appellant touched her vagina on the inside and the outside. She said that this happened at her house, his house, and her grandmother's house. He would put a blanket or pillow over her while they watched television and assault her underneath the blanket or pillow. He also put his mouth on her breast and put her head underneath the blanket, forcing her to perform oral sex on him. He made her put her hand on his penis and move her hand up and down. She never told anyone about Appellant abusing her until V.J. started making disclosures. Later in her testimony, [M.M.] said that she did disclose to [Ms.] Swanger, on the night before [Ms.] Swanger's wedding to Appellant, that Appellant had touched her. [M.M.] said [Ms.] Swanger and a friend, Josephy Delany[,] confronted Appellant, and Appellant confessed. Appellant said, "Yes, I did, but it was a mistake. I'm sorry for it happening."

Once the Commonwealth rested, Appellant's counsel called Renae Jefferies, Appellant's mother, to testify. She denied seeing any concerning interactions between Appellant and V.J. Although she characterized her relationship with V.J. as good, V.J. never told her about Appellant touching her inappropriately.

Next, Stanley Church testified that he and his daughters lived with Appellant, [Ms.] Swanger, and V.J. in Renae Jefferies house for a period of time in 2022. [Mr.] Church testified he

- 5 -

never saw Appellant act inappropriately toward V.J. or towards [Mr.] Church's daughters. Cathy Lipsie's testimony followed. She stated that Appellant ha[d] a reputation in the community of being peaceful, law abiding and a "good parent." Lisa White also testified that Appellant had a reputation in the community for being peaceful and law-abiding.

Brooke McElhattan testified that she was Appellant's [biological cousin] and [M.M.'s] sister. Brooke [McElhattan] testified that Appellant babysat her and her sister several times, and she never saw Appellant touching [M.M.] inappropriately. Brooke [McElhattan] stated that if something had happened while she was in the living room, she would have noticed because the room is small, and she was "very attentive." Brooke [McElhattan] further stated that Appellant could not have touched [M.M.] in the bedroom shared [by the sisters], because Brooke [McElhattan] was a light sleeper and would have awoken. Brooke [McElhattan] said that Appellant never touched her inappropriately or did anything that made her feel uncomfortable. Brooke [McElhattan] testified that [M.M.] ha[d] a reputation for being a liar.

Lastly, Appellant testified. Appellant denied any wrongdoing regarding V.J. or [M.M.].

Trial Court Opinion, 4/30/25, at 3-8 (footnotes and internal citations omitted).

At the conclusion of trial, the jury convicted Appellant of aggravated indecent assault of a child, unlawful contact with a minor, aggravated indecent assault without consent, indecent assault - person less than 13 years of age, endangering the welfare of a child, and corruption of a minor.[2] On December 12, 2024, the trial court sentenced Appellant to an aggregate term of 14 years and eight months to 29 years and four months' incarceration, with three consecutive years of probation. Appellant filed a post-sentence motion on

_____

[2] 18 Pa.C.S.A. §§ 3125(b), 6318(a)(1), 3125(a)(1), 3126(a)(7), 4304(a)(1), and 6301(a)(1)(ii), respectively.

- 6 -

December 21, 2024, which the trial court denied on January 23, 2025. This timely appeal followed.

Appellant now raises the following issues for our consideration.

1. Whether the trial court erred by admitting Commonwealth evidence of [Appellant's] prior bad acts when Pa.R.E. 404(b) makes such evidence inadmissible?

2. Whether the trial court erred by preventing [Appellant] from asking questions about Ms. Swanger's prior actions when those actions include falsely accusing [Appellant] of making a gesture in the courthouse hallway?

Appellant's Brief at 7 (unnecessary capitalization omitted).

In his first issue, Appellant argues that the trial court erred in admitting M.M.'s testimony and, as such, this Court must vacate his judgment of sentence and remand the matter for a new trial. The trial court herein found that M.M.'s testimony fell within the common plan, scheme, or design exception of Pennsylvania Rule of Evidence 404(b). Trial Court Opinion, 4/30/25, at 10. More specifically, the trial court found that the similarities between the victims, *i.e.*, V.J. and M.M., supported the admission of such evidence under Rule 404(b). *Id.* at 10. In reaching this conclusion, the trial court cited multiple similarities that, in its view, existed between Appellant's conduct toward M.M. and Appellant's conduct against V.J. In particular, the trial court opined:

> The victims were both prepubescent female children who are biologically related to Appellant. Appellant knew his victims well, and he was trusted enough by their mothers for him to babysit them often. Both victims had been sexually assaulted by [Appellant] on multiple occasions while Appellant babysat them. Lastly, both victims reported a course of conduct which

- 7 -

included digital penetration and forced touching of Appellant's penis.

***Id***. at 10-11. Because of the aforementioned "commonalities," the trial court held that Appellant's prior bad acts were admissible. ***Id***. at 11. We are constrained to disagree.

On May 3, 2024, the court granted the Commonwealth's motion *in limine* to admit the testimony of M.M. pursuant to Pa.R.E. 404(b). "We review a trial court's decision to grant a motion *in limine* for an abuse of discretion." ***Commonwealth v. Ribot***, 169 A.3d 64, 67 (Pa. Super. 2017) (citation omitted). "An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." ***Commonwealth v. Johnson***, 107 A.3d 52, 68 (Pa. 2014) (citation omitted).

This Court previously outlined the law regarding the admission of prior bad act evidence as follows:

> Evidence of distinct crimes is not admissible against a defendant [subject to prosecution] for another crime solely to show his bad character and his propensity for committing criminal acts. However, evidence of other crimes and/or violent acts may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character.
>
> These other purposes include[,] *inter alia*[,] (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to

prove the other; or (5) the identity of the person charged with the commission of the crime on trial.

**Commonwealth v. O'Brien**, 836 A.2d 966, 969 (Pa. Super. 2003) (citations omitted). If, in a criminal case, the court finds that such evidence is admissible for non-propensity purposes, Rule 404(b)(2) then requires that the trial court assess whether the "probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Importantly, to assess Appellant's claim, we must consider a recent decision promulgated by our Supreme Court which thoroughly outlined the "parameters of the 'common plan, scheme and design' [] exception" to Rule 404(b)'s prohibition against mere propensity evidence. **See Commonwealth v. Walker**, 2026 WL 247429, *1 (Pa. 2026).[3]

In **Walker**, the appellant, Derrick Walker, was charged in July 2019 with three counts of rape, relating to his assaults against "three different victims on three separate occasions: P.C., in January [] 2011; T.A., in December [] 2014; and B.H., in January [] 2015." **Id.** The Supreme Court detailed the relevant facts of each assault as follows:

> [] On January 20, 2011, around midnight, P.C. left her home in the Oxford Circle neighborhood in Philadelphia[, Pennsylvania] to walk to a nearby 7-11 convenience store to purchase cigarettes. She was outside the store when Walker, whom she did not know, approached, "flashed money at [her,] and said 'you know what to do for this.'" Although P.C. testified that she was not a prostitute and that she "had a bad feeling[,]" she

---

[3] The decision was authored by Justice McCaffery, and joined in full by Justices Donohue and Wecht. Justice Dougherty joined the decision in part. Chief Justice Todd authored the dissent, which Justices Mundy and Brobson joined.

followed Walker to the alley behind the 7-11; P.C. claimed she did so because she was scared. Once isolated, Walker pushed P.C. to her knees and tried to force her to perform oral sex on him. When she resisted, he punched her in the face and threw her body against a car that was parked in the alley. Walker then forcibly pulled down P.C.'s pants and raped her. Afterwards, P.C. pulled up her pants and followed him back to the front of the store. When Walker told her he was going to get money to pay her, P.C. stated she was not a prostitute. He then walked away, and P.C. ran home. She testified that she took off her clothes and cried for hours until her husband woke up and called the police. P.C. went to the hospital the next morning and underwent a sexual assault examination. The nurse examiner prepared a rape kit report. Sperm recovered from a vulva swab resulted in a male DNA profile that did not match any existing profiles in the database.

[] On the morning of December 2, 2014, T.A., a recovering drug addict, attended a methadone program near 7th Street and Girard Avenue in Philadelphia. After leaving the program around 11:00 a.m., she headed to a nearby doughnut shop where she would often meet with friends. When she arrived, Walker, whom she did not know, was standing outside. He inquired whether she was interested in purchasing headphones. When T.A. expressed interest, Walker asked her to walk up Girard Avenue with him because he also "had drugs on" him and did not want to exchange anything on the street. As they walked, Walker put his arm around T.A. She was not alarmed by this because of her prior experience purchasing drugs — sellers would often put their arms around buyers to give the appearance of familiarity. However, T.A. then felt a knife at the base of her neck. Walker calmly told her, "you're going to do what I'm telling you to do" and "[w]e're going to keep walking."

Walker led T.A. across Girard Avenue towards an alley. As he did so, he took her money and cell[ular tele]phone. When they reached the alley, Walker pushed T.A. to the ground and forced her to perform oral sex on him. He then grabbed her face, turned her around, and pushed T.A. against a fence before raping her. Next, Walker instructed T.A. to walk in the opposite direction from him; he did not return her phone or money. T.A. ran to a store a few blocks away, where she immediately called her boyfriend and the police. She underwent a sexual assault examination at the Philadelphia Sexual Assault Response Center (PSARC). The nurse examiner prepared a rape kit report.

- 10 -

Sperm recovered from a perianal swab resulted in a male DNA profile that did not match any existing profiles in the database.

[] B.H. recently moved to Philadelphia and was living in the area of 55th and Thompson Streets. At approximately 11:30 a.m. on January 12, 2015, as she was exploring the neighborhood, she asked a woman where she could buy loose cigarettes (commonly known as "loosies"). As she attempted to follow the woman's directions, she ran into Walker, whom she had never met. B.H. then asked him where she could purchase "loosies." Walker responded that he sold them, but did not have any on him at that time. He told her to follow him, which she did. Walker led B.H. to the rear of a nearby house. B.H. handed Walker some money, and he then entered the property. While she waited for him, B.H. made a phone call. After the call ended, she "felt someone come behind [her], put their hand over [her] mouth, and trip [her] forward onto the ground [and] on [her] stomach." When her attacker attempted to pull down her pants, she screamed; he then struck her in the back with a tire iron. The attacker was able to remove her pants and forcibly rape B.H. while she begged him to stop. The attacker then fled. B.H. ran home and immediately called the police, who were able to recover the tire iron. B.H. underwent a sexual assault examination at PSARC, and the nurse examiner prepared a rape kit report. Sperm recovered from a perianal swab resulted in a male DNA profile that did not match any existing profiles in the database.

*Id.* at *2 (internal citations omitted). The unknown DNA profile was not linked to Walker until July 2019. At that time, the Commonwealth charged him with various sexual offenses at three separate dockets.

Thereafter, the Commonwealth sought to consolidate the three dockets under Pa.R.Crim.P. 582 for trial.[4] The Commonwealth argued that

---

[4] Pa.R.Crim.P. 582 provides, in relevant part, as follows:

(1) Offenses charged in separate indictments or informations may be tried together if:

*(Footnote Continued Next Page)*

- 11 -

consolidation was permissible because "each assault would be admissible in a trial for the others [under Rule 404(b)] because the assaults shared sufficient similarities to establish a common plan, scheme or design." *Id.* at *3. The trial court granted the Commonwealth's motion and the matter proceeded to trial. Ultimately, a jury found Walker guilty of multiple sexual offenses at each docket. Thereafter, Walker appealed his conviction and asked the Supreme Court to address, *inter alia*, "what test should be employed in determining when 'other act' evidence satisfies the 'common plan' exception under Pa.R.E.404(b)[?]" *Id.* at *5.

To address Walker's claim, Justice McCaffery, who authored the majority opinion, traced the "genesis" of the common plan, scheme or design exception to Rule 404(b) "back to [the Court's] nineteenth century decision in *Shaffner v. Commonwealth*, 72 Pa. 20 (1872)." *Walker*, 2026 WL 247429 at *6 In *Shaffner*, the Commonwealth sought to introduce evidence that Shaffner, the defendant, who was on trial for poisoning his wife, previously poisoned John Sharlock. In considering whether such evidence was admissible under the common plan, scheme or design exception, our Supreme Court opined:

---

(a) the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion; or

(b) the offenses charged are based on the same act or transaction.

*Id.* at 582(a)(1).

> To make one criminal act evidence of another, a connection between them must have existed in the mind of the actor, linking them together for some purpose he intended to accomplish; or it must be necessary to identify the person of the actor, by a connection which shows that he who committed the one must have done the other. Without this obvious connection, it is not only unjust to the prisoner to compel him to acquit himself of two offences instead of one, but it is detrimental to justice to [burden] a trial with multiplied issues that tend to confuse and mislead the jury. The most guilty criminal may be innocent of other offences charged against him, of which, if fairly tried, he might acquit himself. From the nature and prejudicial character of such evidence, it is obvious it should not be received, unless the mind plainly perceives that the commission of the one tends, by a visible connection, to prove the commission of the other by the prisoner.

*Id.* at 65. This pronouncement, as indicated in **Walker**, resulted in the evolution of a "two-fold test to determine the admissibility of (arguably propensity) evidence pursuant to the common plan, scheme or design exception." **Walker**, 2026 WL 247429 at *7. In particular, such evidence would be admissible if:

> (1) a previously conceived plan that linked the prior crime and present crime together for a singular purpose or (2) crimes so similar that they must have been committed by the same actor.

*Id.* The first exception, *i.e.*, the "'linked plan' exception" requires the prosecutor to establish "that the defendant formed 'a single, overall grand design' and that each bad act or crime is an 'integral component of the same plan'" while the second exception, *i.e.*, the "*modus operandi*" exception, demanded "a pattern of criminal behavior so distinctive that investigators attribute it to the work of the same person." *Id.*

- 13 -

In the **Walker** Court's view, **Shaffner**'s attempt to circumscribe the common plan, scheme or design exception so as to minimize propensity evidence was subsequently "relaxed" over the years. **Walker**, 2026 WL 247429 at *7, *citing* **Commonwealth v. Wable**, 114 A.2d 334 (Pa. 1955). In particular, the High Court determined that "**Shaffner**'s two-pronged common plan, scheme or design exception morphed into a more general consideration as to whether the defendant's other bad acts share 'sufficient similarities' with the offense on trial." **Walker**, 2026 WL 247429 at *7. This "watered-down" approach subsequently became known as the "logical connection" test. **Id.** at *8 and *13. The **Walker** Court opined, however, that the "logical connection" test failed to "require proof of an overarching plan or scheme linking the criminal acts together" or "demand the same high level of similarities between the acts as admission under the *modus operandi* or signature crime exception" as originally contemplated by **Shaffner**. **Id.** at *13. Instead, the "logical connection" test "appear[ed] to be a hybrid of [the two **Shaffner**] exceptions" and allowed evidence of other acts if the acts "are **similar enough** for a jury to conclude the same perpetrator committed them." **Id.** (emphasis in original). This, per the **Walker** Court, "[ran] afoul of the purpose of Rule 404(b) and invite[d] the admission of impermissible propensity evidence." **Id.**; **see also id.** at *14 (explaining that, because prior decisions "simply require[d] 'shared characteristics' between the crimes and the victims" to be admissible under the common plan, scheme and design exception to Rule 404(b), "our case law has strayed from traditional

exceptions to the preclusion of other bad acts and teetered on the line of allowing propensity evidence"). Accordingly, the High Court concluded that it was "time to return to the origin of the common plan, scheme or design exception, and limit the admission of other bad acts evidence to those cases involving a common goal (*i.e.*, 'linked plan') or signature crime." *Id.* at *15.[5]

Thereafter, the **Walker** Court detailed the type of showing the Commonwealth must make for a court to allow other acts evidence to be admitted under the common plan, scheme, or design exception to Rule 404(b). It stated:

> When the admissibility of the defendant's other bad acts is premised upon the common plan, scheme or design exception, the Commonwealth must establish either: (1) the offenses constituted "signature crimes" — that is, they are so unique and distinctive that they must have been committed by the same perpetrator — or; (2) the offenses were linked to achieve a common goal.

*Id.* at *16, *citing* **Shaffner**, 72 Pa. at 65. The Court then determined that the trial court abused its discretion in granting the Commonwealth's motion to consolidate the three rape cases for trial, in part, on the basis that the three

---

[5] Justice Dougherty joined the Majority Opinion in so far as it disavowed the logical connection test. **See Walker**, 2026 WL 247429, at *28 ("I agree with the majority 'the time has come for this Court to acknowledge that the 'logical connection' test runs afoul of the purposes of Rule 404(b) and invites the admission of impermissible propensity evidence.'") (J. Dougherty, concurring and dissenting opinion). Justice Dougherty, however, wrote separately to express his opinion that, "in appropriate circumstances, an 'unlinked plan' theory could serve as an exception to Rule 404(b)'s general rule of exclusion." *Id.* at *30; *see id.* at *30, n.3 (J. Dougherty explaining: An "'unlinked plan' theory allows for admissibility where the actor applied the same plan or methodology to accomplish unrelated crimes.").

assaults shared sufficient similarities to establish a common plan, scheme or design. In reaching this conclusion, the Court explained that the Commonwealth failed to present "any evidence of a preconceived plan [in Walker's mind] or [had a] common goal linking the three rapes together." *Walker*, 2026 WL 247429 at *16. Instead, "the evidence reasonably suggested [that Walker] raped women when he was presented with the opportunity to do so." *Id.* at *14. In addition, the High Court did not believe that the facts of each rape to be "so unique or distinctive to qualify as signature crimes." *Id.* at *14 and *16. Instead, it was apparent that the Commonwealth and trial court "relied on the 'logical connection' between these similar rapes, a far too lax interpretation of the common plan, scheme or design exception." *Id.* at *16. Based upon the foregoing, the Court vacated Walker's judgment of sentence and remanded the matter for a new trial.

In applying the foregoing to the facts to the instant case, we initially note that, in deciding to admit M.M.'s testimony at trial, it is apparent that the trial court applied the "logical connection" test that the *Walker* Court determined "runs afoul to the purpose of Rule 404(b) and invites the admission of impermissible propensity evidence." *Id.* at *13. Indeed, in assessing whether to allow the admission of M.M.'s testimony under Rule 404(b) as evidence of a common plan, scheme or design, the trial court reviewed the facts underlying the other acts evidence, *i.e.*, M.M.'s abuse, and the facts underlying the current criminal charges, *i.e.*, V.J.'s abuse, and

determined that they were similar enough to evidence a common plan, scheme or design. *See* Trial Court Opinion, 4/30/25, at 10-11 (opining that the similarities included, *inter alia*, the victims' ages, how Appellant secured access to the victims, and the sexual acts committed against each victim). As our foregoing discussion of *Walker* demonstrates, the trial court's identification of the overlapping similarities exhibited in Appellant's criminal conduct no longer comports with Pennsylvania jurisprudence governing the application of the common plan, scheme or design exception under Rule 404(b). Thus, the trial court's determination cannot stand.

In addition, we conclude that the evidence presented falls woefully short of meeting the threshold for admission under Rule 404(b) as set forth in *Walker*, *supra*. The evidence established the following circumstances of Appellant's assaults against V.J. and M.M..

- Appellant is V.J.'s biological father.
- Appellant is M.M.'s biological cousin.
- Appellant allegedly abused V.J. when she was approximately 6 years old.
- Appellant allegedly abused M.M. when she was 10 years old and continued until she was 13 years old.
- Appellant was approximately 27 years old at the time he allegedly abused V.J.
- Appellant was approximately 15 years old at the time he allegedly began abusing M.M.
- Appellant allegedly abused V.J. by digitally penetrating her vagina and, in one instance, forcibly placing her hand on his penis.

- 17 -

- Appellant allegedly abused M.M. by foundling her breasts, digitally penetrating vagina, forcing her to perform oral sex, and raping her.

- Appellant allegedly abused V.J. in his bedroom while watching a movie or in the living room of his mother's home, where both Appellant and V.J. lived.

- Appellant allegedly abused M.M. in her home, her grandmother's home, and Appellant's home.

- Appellant allegedly abused V.J. when no one else was around.

- Appellant allegedly abused M.M. while babysitting her and her two sisters. The abuse occurred in the presence of both sisters, as well as a family friend.

The Commonwealth did not present any evidence that Appellant "had a preconceived goal in mind, other than satisfying his own salacious interests." **Walker**, 2026 WL 247429 at *14. Instead, "the evidence reasonably suggested [that Appellant sexually assaulted young female victims] when he was presented with the opportunity to do so." **Id.** In this same vein, the record reveals nothing unique, unusual, or distinctive about the way M.M. and V.J. were sexually abused.[6] To the contrary, the chief similarity here was that each victim was related to Appellant which, unfortunately, "is the kind of familial connection that is all too common when children are sexually abused." **Commonwealth v. Smith**, 2024 WL 4650893 *1, *6 (Pa. Super. Nov. 1,

_____

[6] While the **Walker** Court opined that the "signature crime, or *modus operandi*, exception [was] most relevant when the identity of the perpetrator [was] at issue," it analyzed Walker's actions to determine whether they were "so unique or distinctive to qualify as a signature crime" even though his identity was not in question because DNA evidence tied Appellant to the criminal episodes. **See Walker**, 2026 WL 247429, at *15-*16; **see also id.** at *3.

2024) (non-precedential decision). Hence, their accounts "establish[], at most, the commission of crimes or conduct in the past 'of the same general class,' namely physical and/or sexual assaults." ***Commonwealth v. Bidwell***, 196 A.3d 610, 626 (Pa. Super. 2018). Because the Commonwealth failed to establish that the offenses involved a "common goal (*i.e.*, 'linked plan') or a signature crime," we hold that, by allowing M.M.'s testimony as evidence of a common plan or scheme, the trial court abused its discretion. ***See Walker***, 2026 WL 247429, at *15.

We further hold that the admission of M.M.'s testimony was not harmless. ***See Commonwealth v. Hicks***, 156 A.3d 1114, 1157 (Pa. 2017) (Wecht, J., dissenting) ("It is natural and well-nigh inevitable . . . that a juror will conclude that, if a person has assaulted women before, he likely will do so again."). This matter came down to the credibility of V.J.'s allegations. Indeed, the Commonwealth presented substantial evidence seeking to support V.J.'s credibility, including the fact that V.J.'s reports of the sexual abuse to others, namely, her teachers, Ms. Brancato and Ms. Mravantiz, and during a forensic interview, were consistent. Appellant, however, contended that V.J. fabricated her claims under pressure from her mother, Ms. Swanger. Apart from V.J.'s allegations, there was no physical evidence relating to the alleged sexual abuse.[7] It is apparent, therefore, that the admission of M.M.'s

_____

[7] While the Commonwealth introduced testimony that V.J. was diagnosed with pinworms in April 2023, after she revealed the alleged abuse to Ms. Swanger, *(Footnote Continued Next Page)*

- 19 -

testimony was essential to the Commonwealth's case and could have improperly bolstered V.J.'s credibility. **See Hicks**, 156 A.3d 1156-1157 (J. Donohue, dissenting) (noting that the "Commonwealth [] repeatedly and unambiguously argued that its case against [the defendant] was largely circumstantial and that it viewed the bad acts testimony as essential to proving the elements of first-degree murder beyond a reasonable doubt" and, as such, the admission of the bad acts evidence was "far from harmless"). In fact, in its closing statement, the Commonwealth essentially conceded this very point. It stated:

> Now [M.M.] has never heard [Ms. Swanger] testify, but interestingly enough [Appellant] seems to have [a *modus operandi*] because he digitally penetrated his cousin when she was [10].
>
> So he likes female children right around the age of prepubescent to just post pubescent ages. They are all family. They are people that he, we know, gets to have alone time with.

N.T. Trial, 9/16/24, at 43-44 (emphasis added). Moreover, the admission of M.M.'s testimony improperly required Appellant to defend against secondary criminal acts, for which he was not charged. **See Shaffner**, 72 Pa. at 68 ("It was therefore unjust to the prisoner to compel him, on his trial for the murder of his wife, to defend against the charge of murdering Sharlock."). Based

---

the Commonwealth failed to present any testimony or evidence that V.J.'s condition was linked to the alleged abuse. To the contrary, there was evidence that V.J.'s condition was related to hygienic issues, which is the prime cause of pinworms. **See** N.T. Trial, 9/13/23, at 89 (Appellant's mother testifying that V.J.'s hygiene "was not good" and that "[s]he was not a kid who was in a hurry to get to the bathtub and would find excuses not to.").

upon the foregoing, we are therefore constrained to vacate Appellant's judgment of sentence and remand for a new trial.[8]

Judgment of sentence vacated. Case remanded for further proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

4/21/2026

---

[8] Due to our disposition of this matter, we need not address the final issue raised by Appellant on appeal.